State
vs. } Ind. No. 2535.
Elliot R. Hathaway, alias.

September 19, 1931.

WALSH, J. Heard on defendant's motion for a new trial after verdict by jury of guilty of murder in the first degree.

The motion for a new trial sets forth thirty-three grounds. The first four grounds are the usual ones: First, that the verdict is against the law; second, that the verdict is against the evidence; third, that the verdict is against the law and the evidence; and, fourth, that the verdict is against the law, the evidence and the weight thereof. The fifth ground alleges the discovery of new and material evidence since the trial. Grounds 6, 8, 9, 10, 11, 12, 22, 23, 25, 32 and 33 may be grouped as referring to the selection and conduct of the jury. Grounds 13, 14, 15, 16, 17, 18, 19, 20, 21, 24, 26, 28, 29, 30, 31 may be grouped as referring to the conduct of the Attorney General, and ground 7 may be considered as referring to the conduct of the trial.

## ADMITTED FACTS IN THE CASE.

On March 23, 1931, about 7:45 p. m.,
the defendant, a man 27 or 28 years of age, a basket-ball and football player, took a young woman, 20 years of age, who was a student nurse at the Truesdale Hospital in Fall River, for an automobile ride in the State of Rhode Island. The next morning, the body of the young woman was found in a depression beside the private driveway of the Winward Estate in Tiverton, Rhode Island. An autopsy was performed on the body on March 24 or March 25 and the findings of the doctors performing the autopsy were that death was caused by manual strangulation. The defendant was arrested and indicted for murder by a grand jury.

## SELECTION OF THE JURY TO TRY DEFENDANT.

In view of the strenuous arguments by defendant's counsel in prior proceedings in the case that the prejudice against defendant due to newspaper articles was so strong as to preclude the possibility of securing a fair and impartial jury to try the cause, the Court ordered a panel of 120 veniremen to be called by the Jury Commissioner. Of this number of possible jurymen, but 26 were called to the stand for examination. These 26 persons were subjected to a careful and thorough examination by the Attorney General and defence counsel with particular attention to fixed opinions, if any, bias, prejudice, the influence of newspaper articles upon their minds, etc. Upon the final selection of the panel, the defendant had one peremptory challenge which he did not see fit to use. The jury was a body of mature men of experience and judgment and declared itself ready to decide the case upon what it heard in the court-room and upon no other evidence. The members of the jury gave their undivided attention to the case for three weeks and at no time during the trial was there any indication that a single member of the panel was not

paying strict attention to what was transpiring before the Court.

In the absence of any testimony on the part of defendant that the jury or any member thereof was partial, prejudiced, was influenced by newspaper articles or that their minds were inflamed by public opinion, we must assume that the jurors were fair and impartial and acted in accordance with their oaths. Public opinion, inflamed or otherwise, was not before us. Our sole obligation was to secure a jury of twelve fair and impartial men to try the defendant on the facts and the law presented in the Court-room. This we succeeded in doing and there is no evidence to the contrary offered by defendant. Further, there is no proof adduced by defendant tending to show that the jury did not take adequate time for their deliberation and verdict, none that the jury did not give proper and adequate consideration to the case, none that the minds of the jurors were inflamed by public opinion and none that the jury was unable to give fair and impartial consideration to the case. Mere allegations by counsel, unsupported by proof, can not be considered seriously. Grounds 6, 8, 9, 10, 11, 12, 22, 23, 25, 32 and 33, therefore, we find to be without merit.

In reference to the grounds claiming misconduct on the part of the Attorney General in the presentation of the case, particularly in the argument to the jury, we find that no objection was made by counsel for the defendant at the time of the occurrences alleged, no request was made to the Court during the argument for relief, no rulings were made by the Court on the matters alleged to be prejudicial to defendant and no exceptions were taken to rulings of the Court on such matters. Under the well-settled decisions of our Supreme Court in *State* vs. *Hull*, 18 R. I. 207 (1893), and *State* vs. *Farr*, 29 R. I. 72 (1908), followed by a rescript of the Superior Court in *State*

vs. *Rolf G. Adams* (April 19, 1921), these elements as stated in the motion are not grounds for a new trial. It was the duty of defendant to request the Court to instruct the jury to disregard these remarks of the Attorney General alleged to be objectionable at the time they were uttered, and if the Court refused so to do, to take an exception to such action by the Court. Under this rule, the defendant takes no benefit from grounds 13, 14, 15, 16, 17, 18, 19, 20, 21, 24, 26, 28, 29, 30, and 31 of his motion.

Ground 7 of the motion alleges that the defendant did not receive a fair trial because for a long time prior to and at the time of the trial of this case, public opinion in Newport County was so strongly inflamed against the defendant that a fair trial of the defendant in Newport County was impossible under all the circumstances surrounding the case. This matter of inflamed public opinion was suggested at the very beginning of the case at the hearings on motions for a continuance, change of venue, etc. Mr. Jacobs, of counsel for defendant, filed affidavits. The impression was given to the Court that personal violence to defendant and his family had been threatened by a mob surrounding the Court House. Mr. Justice Pouliot, who presided at the hearing on the motions, saw a crowd, mostly women and school children, prompted probably by curiosity, standing about the Court House but neither saw nor heard any indication of inflamed public opinion or threats of bodily harm to anyone. In support of this claim, defendant has introduced the testimony of Mr. Hurley and Mr. Nolan, of his counsel, Mr. Albro, a newspaper man, and a private detective hired by defendant to procure such evidence, if possible. We may assume that diligent effort was made by defendant and his counsel to procure such evidence. The result of their efforts does not produce any appreciable

number of persons in Newport County who felt or were willing to state under oath that any prejudice or inflamed public opinion against defendant existed in Newport County before, at the time or after the trial. The Court did its best to give the defendant a fair and impartial trial according to the law of our State; the jury was fair and impartial and gave careful attention to the whole case, the attorneys tried the case according to their best judgment and there was no indication to the Court at any time, either in or out of the Court-room, of any inflamed public opinion or prejudice against defendant. It was not only possible under the circumstances to give the defendant a fair trial but on the contrary, in our opinion, no defendant could have received fairer consideration from all concerned, the people of Newport County, the Court, the jury, counsel, witnesses and officials of the Court. Ground 7 must, therefore, be held to be without merit.

Ground 5 of the motion alleges the discovery of new and material evidence since the trial which could not have been discovered before. In support of this ground we have the affidavit of Dr. Francis P. McCarthy of Boston, an expert called by the defense. Dr. McCarthy was present in the Court-room when Dr. Round was testifying; he must have known the medical facts about which he testifies in his affidavit at that time; he could have been put on the witness stand at that time to testify as to those facts; in his affidavit there is no new and material evidence disclosed which was not available at time of trial. Therefore, ground 5 has no merit.

We shall now consider the four usual grounds of motions for new trial, viz.:—1.) that the verdict is against the law; 2.) that the verdict is against the evidence; 3.) that the verdict is against the law and the evidence, and 4.) that the verdict is against the law, the evidence and the weight thereof. In the argument by defendant upon these grounds, it is insisted that in this case there is no proof of murder in the first degree, that there is no evidence to show intent sufficient to justify finding guilt in first degree, that there is no testimony to show rape or attempted rape and that the verdict is against the weight of the evidence. The State introduced evidence, in substance, as follows: On March 23, 1931, the defendant, 27 years old, a basket-ball and football player, took Miss Russell, a student nurse, 20 years old, in normal health, for an automobile ride; that they drove to a drugstore in Fall River, where defendant went inside and the girl remained in the car; that, while in the drugstore, defendant telephoned upstairs to a bootlegger and ordered 1/5 gallon of gin; that this gin was delivered to defendant in the backyard of the drugstore premises; that defendant purchased a small bottle of ginger ale in the drugstore and returned to the automobile carrying the gin and ginger ale; that on the next morning, the body of the girl was found in a private driveway, about 200 feet from Stafford Road, a public highway, of the Town of Tiverton, Rhode Island; that Drs. Bryant, Peaslee and Magrath examined the body during two autopsies; that the cause of the girl's death according to these three doctors was manual strangulation and that the marks on the throat of deceased were caused by a human hand; that the defendant at 7:25 p. m. on March 23, 1931, left the house of one Galvin, saying to Galvin that he had a date with a nurse and that he would drop in at Galvin's after the date and if he had any liquor they would have a couple of drinks; that defendant wore a moustache at the time and had for a year previously; that defendant wore at the time a fur coat; that about 11:15 p. m., March 23, 1931, defendant again came to Galvin's house and said, "We've

been held up, me and the girl on Stafford Road;" that two men had come up to the car and had ordered him and the girl to get out; that one of the men grabbed the girl by the throat; that she screamed and then the man hit her; that the other man put a gun to defendant's body and told him to "beat it;" that defendant could not see the faces of the men but that they appeared to be about 30 years old and to be Bravas; that defendant said the girl was dead and that he knew she was dead; that defendant fled from Fall River that night, shaved off his moustache the next morning, left his automobile and fur coat in Boston, went to New York by bus March 24th, registered there under an assumed name on the same day but came back later and surrendered to the Attorney General of this State. The State further showed that at the time of the death of the girl, foeces and urine were discharged from her body and had stained her bloomers; that a light dress and a light colored lining of her coat did not show any such spots and that this demonstrated clearly that at the time the girl died her outer dress and coat were above her hips and that the only clothing she had on below her waist at that time were her bloomers, stockings, garters and shoes.

There were other facts and circumstances introduced in evidence by the State which tended strongly to show that the defendant, while in that lonely lane, attempted to take liberties with the girl. Men of experience and common sense, exercising their reason and judgment, could come to no other conclusion. It was also reasonable to conclude from the evidence that this familiarity was resented by the girl and that force was used to compel her to yield or to stifle her outcry. Two teeth, one natural and one artificial and joined together, were dislodged from the front of the girls mouth and were found later on the roadway about four feet from where the head of her body lay. The State could not offer any explanation as to how these teeth were dislodged and the defendant, if he knew, offered no explanation. The bruises on both right and left sides of the girl's throat, which the doctors for the State testified were caused by a human hand, were also unexplained or unaccounted for by defendant. The only eye-witness to the occurrence was the defendant and the State was forced to set forth all the facts and circumstances and allow the jury to draw such reasonable inferences from them as prudent men might draw.

The defendant took the stand and sought to give his explanation of the occurrence. He denied any attempt to injure or assault the girl. He said it was an accidental strangulation caused by a small fragment of this broken tooth becoming lodged in the larynx; that while this small fragment was not sufficient to cover completely the opening of the air passage, when it lodged there it caused a spasm which contracted the larynx and completely occluded the air passage. In this contention, defendant was supported by Drs. Hamilton and McCarthy, but Dr. Gonzales, another expert for the defense, said if this happened the death would be sudden without the asphyxial signs testified to as being present in Miss Russell's body, and Dr. Gonzales further testified that he was unable to give an opinion as to the cause of Miss Russell's death without seeing the body.

Dr. Magrath for the State had testified that Miss Russell was killed by manual strangulation or throttling; that strangulation could not take place accidentally unless the opening to the air passage was completely covered with the foreign object and that if death ensued from such cause the foreign body would be found in the larynx. and in this he was supported by Drs. Bryant and Peaslee. Drs. Magrath,

Bryant and Peaslee had seen the body and had taken part in an autopsy of the body.

The jury saw all these medical gentleman on the stand and noticed the manner in which they gave testimony, the interest that they may have manifested in the outcome of the case and the experience that they had in cases of this kind. They decided that Drs. Magrath, Bryant and Peaslee gave the correct opinion as to the cause of Miss Russell's death and in this decision the Court concurs. The zeal and interest of Drs. Hamilton and McCarthy were apparent and presumably discounted their testimony in the minds of the jury.

The defendant does not claim he was not normal during all the time of this occurrence; he does not claim he was intoxicated; he was in full possession of all his faculties, physical and mental. He makes no claim that he committed the act under the influence of sudden passion produced by adequate provocation. He was the only eyewitness. The absence of spots or soil marks on the dress and lining of the girl's coat show that these garments were not in their proper position at the time the girl died. The only covering to her body below her waist at the time she died were her bloomers, stockings, garters and shoes. Defendant says that just before she choked to death he was kissing and hugging the girl and had his hand on her thigh. Defendant did not notice her broken teeth until she started to choke. Defendant's story of the hold-up to Galvin twenty minutes after he left this girl's body in Winward Lane was admitted by defendant to be a lie. The flight of defendant, his shaving off of his moustache, his abandonment of the fur coat and automobile, his use of an assumed name in New York all point strongly to consciousness of guilt. The evidence is circumstantial but a jury is justified in drawing all proper in-ferences such as reasonable and prudent men might draw from the evidence. From all such evidence, a jury might reasonably find that this girl died while sitting or lying on the right hand side of the rear seat of that automobile; that when she died, her bloomers were showing up to her waist line; that the defendant was there, hugging and kissing her with his hand on her thigh; that she resented the familiarity and screamed; that he struck her so as to dislodge her teeth; that the blow might have been delivered when the girl's mouth was open, trying to scream, hence there was no bruise on the lip; that, thereupon, to force her to his will and to prevent her from resisting his advances, he grabbed the girl by the throat with his right hand and that he held her by the throat for the requisite two or three minutes until she died; that the girl was hampered in her movements by her own heavy coat and the weight of the defendant who wore his heavy raccoon coat and that under these conditions the girl was unable to use physical force to protect herself against this trained athlete. If this picture of the events in Winward Lane was the one that the jury reconstructed from the facts and circumstances adduced by the State, we feel that it was amply justified in its verdict of guilty of murder in the first degree.

Motion for new trial denied.

For the State: Attorney General.

For the defendant: S. Jacobs, George Hurley & John Nolan.